IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

FREDDIE PAUL LAWRENCE,
      Plaintiff,

v.                            Case No. 5:12cv148/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
      Defendant.

---

## MEMORANDUM ORDER

This case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Freddie Paul Lawrence's application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. Plaintiff will be referred to by name, as claimant, or as plaintiff. The parties have consented to Magistrate Judge jurisdiction, pursuant to 28 U.S.C. § 636(c), and FEDERAL RULE OF CIVIL PROCEDURE 73, for all proceedings in this case, including entry of final judgment. (Doc. 10). Upon review of the record before this court, I conclude that the findings of fact and determinations of the Administrative Law Judge (ALJ) are supported by substantial evidence, and that the ALJ correctly applied the law. The decision of the Commissioner, therefore, will be affirmed.

STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing

court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[1] The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . .." *Id.* § 1382c(a)(3)(B).

Pursuant to 20 C.F.R. § 416.920(a)-(g), the Commissioner analyzes a supplemental security income disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, he is not disabled.

2.    If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

---

[1] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts de novo review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity (RFC) and vocational factors, he is not disabled.

Claimant bears the burden at step two of establishing a severe impairment that keeps him from performing his past work. Where this burden has been established, but the impairment does not qualify as a listed impairment, the inquiry must move to step five (or step four in cases where the ALJ decides a claimant can perform his past work). This inquiry often is where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that he cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make

the ultimate vocational determination required by steps four and five.[2]  "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[3]  20 CFR § 416.945(a)(1).  Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict may lead, as in this case, to an adverse determination.

<u>FINDINGS OF THE ALJ</u>

The decision of the Administrative Law Judge (ALJ), affirmed by the Appeals Council, determined that plaintiff is not eligible for benefits.  T. 27-35.[4]  The ALJ

---

[2] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.920(a)(4).

[3] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 416.912(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 416.912(d) through (e).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

[4] The administrative record, as filed by the Commissioner, consists of six volumes, (doc. 9-2 through 9-7), and has 439 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

acknowledged claimant has a number of severe impairments–osteoarthritis status post fractures of right femur, ankle, and leg, hip disorder, chronic obstructive pulmonary disorder (COPD), and depression.  T. 29.  Nevertheless, the ALJ assigned a residual functional capacity of light work, with certain limitations.  Because claimant could not perform the full range of light work, a vocational expert provided opinion evidence as to the step five determination.  Based upon such testimony, the ALJ found that claimant could perform work that existed in significant numbers in the national and state economy.  This finding led to a conclusion that plaintiff is not disabled.

## ISSUES ON REVIEW

On review of the decision, plaintiff argues that substantial evidence does not support the ALJ's decision because 1) the ALJ improperly rejected uncontradicted opinions of the consulting medical experts, and 2) the ALJ failed to conduct a proper assessment of plaintiff's mental residual functional capacity.  (Doc. 12, p. 4).  Based upon these assertions, plaintiff argues that the ALJ erred by concluding that plaintiff has not been under a disability for at least twelve consecutive months.

Amplifying the first point, plaintiff contends that two consulting mental health experts, Dr. Ghostley and Dr. McDowell, found "marked" limitations in multiple areas of mental functioning.  Plaintiff points out that the vocational expert, Mr. Strader, testified at the hearing that an individual having such "marked" impairments would be prohibited from employment.  (Doc. 12, p. 4; T. 66-67).  As to the second, and related, point, plaintiff says that the rules of the Social Security Administration require that assessment of residual functional capacity must include attention to

limitations resulting from mental impairments, which must be expressed in terms of work-related functions. (Doc. 12, pp. 9-10).

FACT BACKGROUND AND MEDICAL HISTORY

Because the issues here concern only assessment of plaintiff's mental impairments, the overview of medical history will focus on the ALJ's treatment of that area. The ALJ noted the following with regard to Drs. McDowell and Ghostley, and also commented upon the findings of two State Agency examiners:

> In December 2009, the claimant was sent by his attorneys for a psychiatry assessment with Ann McDowell, M.D. He reported a history of spinal meningitis (1957), ORIF right femur (1980), wiring of his left and right jaws (2000), and fracture collarbone (1976). The claimant's mental status examination revealed no abnormal psychomotor activity; fair articulation, thinking, thought of content, abstract reasoning, and computation; no loose associations, suicidal or homicidal ideation, obsession, phobias, or delusions; fair insight and judgment; good orientation; intact memory; fair fund of knowledge, and sad affect. Major depression, recurrent, moderate to severe was diagnosed. Dr. McDowell suggested that the claimant increase his Celexa and instructed him to follow-up at the mental health center. It appears as though Dr. McDowell only examined the claimant on one occasion. She completed a questionnaire and opined that the claimant had marked limitations in the areas of "estimated degree of constriction of interests of the claimant" and "estimated degree of restriction of the claimant's daily activities, e.g., ability to attend meetings (church, school, lodge, etc.), work around the house, socialize with friends and neighbors, etc." However, she opined that the claimant had only mild to moderate limitations in all other areas.
>
> The claimant underwent a consultative psychological evaluation with David Ghotley, [sic] Psy.D. in May 2008. The claimant's chief complaint was pain. He reported the ability to perform all activities of daily living, though he indicated it sometimes took longer because he rests. He confirmed he still socializes, but not as much as he used to.

Dr. Ghostley diagnosed the claimant with a depressive disorder of moderate severity. Dr. Ghostley opined that the claimant's ability to function independently and manage finances was unimpaired. He opined that the claimant's ability to understand, remember, and carry out instructions, as well as to respond appropriately to supervisors, co-workers, and work pressures in a work setting was markedly impaired at the time of the examination.

The claimant has symptoms of depression and lacks ability to handle significant stress because of reduced energy (fatigue) and increased frustration intolerance. However, at the residual functional capacity level discussed above, the claimant is capable of sustaining work. The undersigned gives little to no weight to the consultative examiner Dr. Ghostley's opinion discussed above as it is too restrictive compared to the objective clinical findings. The undersigned gives some weight to Dr. McDowell's findings/opinions. Dr. McDowell's mental examination was essentially normal. However, Dr. McDowell opined that the claimant was markedly limited in the areas of "estimated degree of constriction of interests of the claimant" and "estimated degree of restriction of the claimant's daily activities, e.g., ability to attend meetings (church, school, lodge, etc.), work around the house, socialize with friends and neighbors, etc." The undersigned gives these findings little to no weight as they are inconsistent with Dr. McDowell's notations and the claimant's own testimony regarding his limitations in these areas. Furthermore, Dr. McDowell based her findings on one examination of the claimant, and it appears that she never treated the claimant on any other occasion.

Physicians contracted for by the State Agency reviewed the evidence and offered their expert opinion that despite the claimant's medically determined impairments, he retained the physical ability to perform the exertional demands of at least "light" work as that term is defined in the regulations. These physicians also opined that the claimant's psychiatric conditions did not cause more than a "mild" functional limitation. The opinions of these reviewing doctors have been carefully reviewed and

their "expert opinion evidence" has been considered in accordance with SSR 96-6p.

In this instance, these opinions are given significant weight for several reasons. First, these are disability specialists who had the bulk of the evidence from the treating sources and consultative examiners that now comprise the official record in this case. They considered all of the objective facts at the time they rendered their opinion. Secondly, though they did not have at their disposal the claimant's testimony, that testimony, specifically as it relates to the claimant's activities of daily living, was consistent with the residual functional capacity opined by the reviewing doctors to a significant degree. Finally, the evidence in total does support in general the conclusions put forth by the State Agency doctors. The evidence is part of the record and entitled to the same probative value accorded "expert opinion" evidence.

T. 30-32.

The medical record reveals that on May 8, 2008, plaintiff met with a psychologist, David Ghostley, Psy.D., for a consultative evaluation. T. 346-47. Plaintiff stated that he was applying for disability benefits due to pain. T. 346. Dr. Ghostley noted that plaintiff arrived unaccompanied to the office, having traveled approximately thirty miles to the appointment. T. 346. He was appropriately dressed, with acceptable grooming and personal hygiene. T. 346. Plaintiff had no history of psychiatric treatment. T. 346. He reported that he could do "most everything" as far as daily activities, but that he required frequent rest periods. T. 346. He also endorsed a depressed mood. T. 347. While he did not socialize "as much as he used to," he did go out on occasion. T. 346.

Dr. Ghostley's mental status examination revealed reduced motor activity and productivity of speech, but good eye contact; good cooperation and attentiveness; normal mannerisms; and normal flow of speech. T. 347. While plaintiff's recent

memory and concentration were impaired, he had no hallucinations, obsessions, or compulsions; his fund of information was adequate; and his insight and judgment were adequate. T. 347. Dr. Ghostley estimated that plaintiff functioned in the low average range of intellectual functioning. T. 347. Dr. Ghostley recorded his impression as major depression, moderate; and noted that prognosis was poor without treatment. T. 347. The doctor recommended that plaintiff consult a psychiatrist to address symptoms of depression and anxiety. T. 347. In a "Capability Statement," Dr. Ghostley indicated that plaintiff's ability to understand, remember, and carry out instructions, and respond appropriately to supervisors, co-workers, and work pressures, was "markedly impaired." T. 347. He also indicated that plaintiff's ability to function independently and manage finances was unimpaired. T. 347.

In December 2009, plaintiff was referred by his lawyer to Ann McDowell, M.D., for a psychiatric assessment. T. 420-21. Plaintiff reported eye, leg, hip, jaw, and ankle pain, and chronic anal itching. T. 420. He related a history of three accidents resulting in a broken jaw (twice), a broken femur, and a fractured collarbone. T. 420. He stated that he had been "very depressed" for years, and had been taking Celexa for the past three months, which had helped "a little." T. 420. Plaintiff was living with his brother, who did not work, and his ex-girlfriend, who provided the sole source of household income. T. 420.

Dr. McDowell's mental status examination revealed no abnormal psychomotor activity; normal speech; fair articulation, content of thought, rate of thinking, and computation; fair to poor abstract reasoning; no loose associations, suicidal or homicidal ideations, obsessions, phobias, or delusions; intact immediate, recent, and remote memory; no language abnormalities; and fair insight, judgment, and fund of

knowledge. T. 421. Dr. McDowell recommended that plaintiff increase his Celexa dose in light of his positive response to the medication. T. 421.

Dr. McDowell completed a form for plaintiff's attorneys that asked her to circle the appropriate degree of limitation for each listed activity. T. 417-18. The scale ranged from "none" to an "extreme" degree of limitation. T. 417. Dr. McDowell circled "marked" for "degree of constriction of interests of the claimant;" and for "degree of restriction of the claimant's daily activities." T. 417. She found a "moderate" impairment in interacting with the public; maintaining personal habits; maintaining extended attention and concentration; performing activities within a schedule; and responding appropriately to changes in the work setting. T. 417-18. Finally, she found "mild" impairment in the ability to ask simple questions; getting along with coworkers; understanding, remembering, and carrying out simple and complex instructions; understanding, remembering, and carrying out repetitive tasks; sustaining a routine without special supervision; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace; making simple work-related decisions; responding appropriately to supervision; and being aware of normal hazards. T. 417-19.

As noted by the ALJ, two State Agency consultants, psychologists J. Peterson, Ph.D., and James Cornier, Ph.D., reviewed the chart. Dr. Peterson concluded that plaintiff did not have a severe mental impairment, as he had no restriction in daily activities; no restriction in maintaining social functioning; only mild difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. T. 356-68. In so concluding, Dr. Peterson noted that Dr. Ghostley's opinion was contraindicative of the presence of any diagnosable mental disorder beyond a possible

mild adjustment reaction, arising within a generally unhappy and avoidant individual. T. 368. Dr. Peterson noted that plaintiff lived independently with his brother, and continued to function adequately in a full range of daily activities within his physical and motivational parameters–he shopped, prepared food, handled some financial matters, attended church, watched television, listened to music, read, played chess, went fishing, rode his bicycle, and socialized with others. T. 368.

At the reconsideration level of review, the other state agency psychologist, Dr. Cormier, reviewed the evidence of record and also concluded that plaintiff did not have a severe mental impairment as he had no restriction in daily activities; only mild difficulties in maintaining social functioning and in concentration, persistence, or pace; and no episodes of decompensation. T. 388, 398. In so concluding, Dr. Cormier noted that Dr. Ghostley's opinion of marked limitations was not supported by the record and that plaintiff was still not receiving any treatment for a mental impairment. T. 400.

In a Disability Report, dated March 26, 2008, completed in support of his application, claimant said he had pain in the right leg, right collarbone, and jaw. T. 196. In a Function Report, dated April 22, 2008, claimant reported that typically he watched television; performed some chores such as sweeping, mopping, laundry, dusting, and washing dishes; made light meals; read "a lot" and listened to music; raked; and walked around the yard. T. 233, 235. His hobbies and interests included reading, playing chess, fishing, and riding a bike. T. 237. He spoke on the phone with family and friends every day, and once a week visited a friend and played cards. T. 237. He also went to church once a week. T. 237. Claimant handled stress by taking a walk or listening to soft music. T. 239. He reported an excellent attention

span and said he had good ability to follow written and spoken instructions. T. 238. In addition claimant said he got along very well with authority figures. T. 238.

At the administrative hearing, claimant said he was taking anti-depressant medication, and did not now worry as much about his health or finances. T. 52. He did not participate in any mental health therapy. T. 51-52.

In formulating residual functional capacity, the ALJ concluded that nonexertional limitations precluded a full range of light work. With regard to mental limitations, claimant would be able to perform only routine and uncomplicated work tasks. T. 64-65. As set out in the material from the ALJ's order, quoted above, the ALJ gave little or no weight to Drs. Ghostley and McDowell.

<u>ANALYSIS</u>

Plaintiff argues the ALJ erred by "arbitrarily" rejecting "uncontroverted medical testimony." (Doc. 12, p. 4). Citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982), plaintiff infers that the ALJ impermissibly substituted his opinion for that of the medical experts. In *Freeman*, however, the court reversed because the "record indicates that the ALJ relied on the appearance of the claimant at the time of the hearing." *Id.* Such was error because the decision "improperly suggests that unless pain is visible to the ALJ at the hearing, it is proper to deny the claim." *Id.* Thus plaintiff proceeds upon the assumption that the ALJ here ignored the medical evidence in favor of his own observations of claimant at the hearing. This assumption is not supported by the record and is completely erroneous.

Inherent in the judging function of an ALJ is the need to weigh and evaluate the range of medical opinions appearing in the record. Plaintiff is correct that an ALJ may not simply pick and choose among medical evidence without explanation. "The

ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (*citing Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). "Therefore, when the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,' we will decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.'" *Winschel*, 825 F.3d at 1179 (*quoting Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). A reviewing court may not ignore the error and proceed to determine whether the decision is supported by substantial evidence. *See id.* To simply "say that [the ALJ's] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart*, 662 F.2d at 735 (*quoting Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979) (internal quotation marks omitted)). The question here is whether the ALJ's order has followed the admonition to state with some measure of clarity the grounds for assigning weight to various opinions.

In recognition of the need for guidance applicable to the ALJ's treatment of medical issues, the Commissioner has promulgated a rule to guide evaluation of medical opinions:

**Evaluating opinion evidence**.

\*\*\*\*

**(c) How we weigh medical opinions**. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

**(1) Examining relationship**. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

**(2) Treatment relationship.** Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

**(i) Length of the treatment relationship and the frequency of examination**. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's

opinion more weight than we would give it if it were from a nontreating source.

**(ii) Nature and extent of the treatment relationship.** Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

**(3) Supportability**. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

**(4) Consistency.** Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

**(5) Specialization.** We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

**(6) Other factors.** When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

\*\*\*\*

**(e) Opinions of nonexamining sources**. We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (d) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

\*\*\*\*

(2) Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

(i) Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other

medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled (see § 404.1512(b)(8)).

(ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 CFR § 416.927.

Neither Dr. Ghostley nor Dr. McDowell are treating source physicians. Each saw claimant once, and each visit was directly connected to the application for Social Security benefits. In at least the case of Dr. McDowell, the visit was arranged by counsel, who also provided the check list, portions of which claimant emphasizes now. In evaluating the ALJ's treatment of opinions offered by these doctors, the question is whether the ALJ followed the law as set out above, not simply whether she rejected, or gave little weight to, certain opinions.

Turning first to Dr. Ghostley, plaintiff would credit the doctor's capability statement that, his "ability to understand, remember, and carry out instructions, as well as to respond appropriately to supervisors, coworkers, and work pressures in a

work setting, is markedly impaired." T. 347. Such statement, however, is not the entirety of what Dr. Ghostley reported, and claimant makes no mention of the remainder of Dr. Ghostley's remarks. Moreover, the remainder of the report is instructive, as recognized by the ALJ. Dr. Ghostley documented no objective medical findings supportive of an inability to perform basic mental work-related activities. *See* 20 C.F.R. § 416.921(b). Dr. Ghostley found claimant to be alert, cooperative, and attentive. He had good eye contact, and exhibited no abnormal mannerisms. He had normal flow of speech and was fully coherent and understandable. Claimant was fully oriented to all relevant spheres, and had adequate attention for conversational purposes. He had an average fund of information, with below average abstract thinking. The doctor found no evidence of hallucinations, delusions, phobias, obsessions, or compulsions. Claimant had adequate insight into acknowledging problems, and adequate judgment with regard to social functioning and family relationships. His intellectual functioning was at low average. Also, claimant's "ability to function independently and manage finances is unimpaired." T. 347.

As noted by claimant, the ALJ gave little to no weight to Dr. Ghostley's opinion of marked impairment. T. 31. The ALJ found this opinion too restrictive compared to the objective clinical findings. These findings are set out in full in Dr. Ghostley's report and repeated in the preceding paragraph. With reference to the factors adopted for evaluating medical opinions, the record will bear out that Dr. Ghostley is not a treating source and has no established relationship with Mr. Lawrence. No signs, evidence, or clinical findings have been offered to support the opinion of marked impairment. Perhaps most important, the opinion is not consistent

with the actual clinical findings, reported in some detail, by Dr. Ghostley. *See* 20 C.F.R. § 416.927(c).

In addition to these matters, plaintiff himself made statements inconsistent with the opinion in question. According to claimant, he gets along "very good" with authority figures. He has fair ability to deal with changes in routine. He can finish what he starts. He finds he can handle stress by taking a walk or listening to soft music. T. 238-239. Here, the ALJ's statement that Dr. Ghostley's opinion does not comport well with the clinical findings is completely substantiated and does not constitute error.

As to Dr. McDowell, claimant once again focuses upon a shard of the entire report. The doctor diagnosed "major depression, recurrent, moderate to severe." T. 421. She also marked on a checklist that claimant had a level of "marked" in his constriction of interests and his degree of restriction of daily activities, including attending meetings, work around the house, and socializing with friends. T. 417-419. The ALJ gave some weight to Dr. McDowell's opinions, but gave little weight to the findings of marked restriction. T. 31. According to the ALJ, these findings are inconsistent with Dr. McDowell's other notations and with the claimant's own testimony concerning his abilities in these areas. The ALJ also noted that Dr. McDowell never treated claimant and based her findings on one examination. T. 31. Plaintiff complains that the ALJ's rationale is inadequate, because the ALJ failed to specify what "notations" would be inconsistent. Truly, this is not an insurmountable obstacle.

Dr. McDowell's report of clinical mental status examination shows that claimant was alert. He was fairly neat. He had no abnormal psychomotor activity.

He was cooperative. His speech was at normal volume, with fair coherence, articulation, and spontaneity. His rate of thinking was fair, content of thought was fair, abstract reasoning was fair to poor, and computation was fair. Claimant was oriented to person, place, time, and fairly well oriented to situation. His immediate, recent, and remote memory was intact. He had no language abnormalities and had a fair fund of knowledge. T. 421. To say, as did the ALJ, that the opinion regarding areas of marked restriction is not consistent with the clinical findings would be no overstatement.

Similarly, the ALJ's finding that claimant's own statements do not comport with Dr. McDowell's opinion finds ample support. On his application, claimant reported, as set out above, his ability to deal with stress, authority, changes in routine, and the like. At the hearing, he alleged disability based upon right leg pain and breathing problems. T. 47-48; 50. He takes medication for depression and does not go to counseling. T. 51-52. These medications help him, and he finds he doesn't worry as much about his health and finances. T. 52. Under examination by leading questions from his attorney, claimant said he doesn't like to be around a lot of people, but he gets along with people. T. 58. On further questioning claimant clarified that he doesn't like being around people because he prefers the peace and quiet of the country. T. 58. Arguably commenting on his mental issues, claimant said sometimes when reading, he will lose his train of thought, and have to read the material over. T. 61.

The ALJ did not err by concluding that Dr. McDowell's opinion was inconsistent with her own findings. She also did not err by turning to claimant's own statements concerning his abilities.

In truth, the opinions valued most by claimant are reflected in checklist form, where Dr. McDowell circled one of a series of potential responses to various questions.  T. 417-419.  This document is interesting in more than the two responses identified by claimant.  Although plaintiff does not focus upon the entire document, Dr. McDowell found mild impairment in claimant's ability to ask simple questions or request assistance.  She also found mild impairment in claimant's ability to get along with coworkers and peers.  He had mild restriction in his ability to understand, remember, and carry out simple, or complex, instructions.  He was mildly restricted in his ability to understand and carry out repetitive tasks, and to sustain a routine without supervision.  T. 417-418.

In terms of matters directly related to the workplace, Dr. McDowell's findings are particularly at odds with the somewhat isolated conclusions favored by plaintiff.  Claimant had mild restriction of ability to complete a normal work day and work week "without interruptions from psychologically based symptoms."  T. 418.  Similarly, he was but mildly restricted in ability to make simple work-related decisions.  Consistent with claimant's own statements about authority, Dr. McDowell assessed mild impairment in ability to respond appropriately to supervision.  T. 418.

As with Dr. Ghostley, the ALJ's treatment of Dr. McDowell's opinions is more than supported by the evidence.  Even with a treating physician, the ALJ may reject or afford less weight to opinions for good cause.  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d

1232, 1241 (11th Cir. 2004). Each of these factors may fairly be said to apply to the opinions in question.

In addition, as noted above, the opinions we find ourselves concerned with do not appear in Dr. McDowell's clinical narrative, but, instead, in a check list provided by counsel. Courts have found such preprinted forms do not provide persuasive evidence of the validity of the opinions expressed therein. *See Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("Check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions." (*citing Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993))). I agree, as did the ALJ, that in the context of all the evidence, including Dr. McDowell's own notes, the check off form here is not particularly helpful. Further justification for affirmance may be found in the lack of any explanation for the opinions of marked impairment.

As a final observation, the ALJ did not err by relying upon the opinions offered by the state agency reviewers, Dr. Peterson and Dr. Cormier. As the Commissioner's regulations provide, such agency reviewing sources are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluations." 20 C.F.R. § 416.927(e)(2)(i). The Eleventh Circuit has recognized the import of opinions of consulting physicians who did not themselves examine the claimant. *See Edwards v. Sullivan*, 937 F.2d 580, 585 (11th Cir. 1991) (observing that the ALJ may rely on a non-examining physician's opinion if it does not contradict the examining physician's medical findings or test results in the medical report). No error appears

in the ALJ's finding that the agency physicians found no more than mild functional limitations attributable to claimant's psychiatric condition.

For the reasons set out in the foregoing analysis, plaintiff's second point, alleging the ALJ failed to account for all mental limitations, must also fail. The limitations adopted by the ALJ, i.e., light work limited to routine, uncomplicated tasks, are supported by the evidence. In particular, the adjustments to residual functional capacity are supported by the limitations imposed by Dr. McDowell with specific reference to work activities. T. 417-419. Plaintiff has shown no error in the Commissioner's determinations.

ACCORDINGLY, it is ORDERED:

1. The decision of the defendant Commissioner is AFFIRMED and plaintiff's application for Supplemental Security Income is DENIED.

2. The clerk is directed to close the file.

At Pensacola, Florida, this 30th day of January, 2013.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**